IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| v. | CAUSE NO. 3:23-CR-35-CWR-LGI |
| THEODORE M. DIBIASE, JR., | |
| *Defendant.* | |

## ORDER

Mississippi is blessed with abundance. We have literary and musical riches; ancestral and spiritual wealth abound. The only thing we don't have is money.[1] About one in four Mississippians receives health coverage from Medicaid.[2] Roughly one in five Mississippians lives in poverty.[3] And about one in six Mississippi households doesn't have enough food for an active, healthy life.[4]

A federal grant program called Temporary Assistance to Needy Families (TANF) tries to alleviate some of this need. Mississippi received $86 million in TANF funds in 2022.[5] The headline figure is an illusion, though. That year only $4 million—less than 5% of the total—

---

[1] About that. A few years back, the State's economic development czar tweeted that Natchez had the most millionaires per capita of a U.S. city before the Civil War. That actually is true. Half of America's millionaires lived in Natchez, at one time. *See* Peter Tonge, *Natchez: in 1850 half of the millionaires in the US lived here*, Christian Sci. Monitor (Mar. 22, 1983). It was not worth bragging about, however, since that wealth was obviously derived from slavery. The official deleted his tweet. *See* Andy Cush, *Mississippi Official Explores Dark Underpinnings of American Wealth*, Gawker (Aug. 3, 2016).
[2] Miss. Div. of Medicaid, 2022 Annual Report at 1.
[3] Craig Benson, U.S. Census Bureau, *Poverty in States and Metropolitan Areas: 2023*, at 11 (Sept. 2024).
[4] U.S. Dep't of Agric., Econ. Rsch. Serv., *State Fact Sheets: Mississippi* (updated Sept. 5, 2024).
[5] Ctr. on Budget & Pol'y Priorities, *Mississippi TANF Spending* at 2, https://www.cbpp.org/sites/default/files/atoms/files/tanf_spending_ms.pdf.

was distributed as cash assistance to families.[6] That's under $50,000 for each of Mississippi's 82 counties. The rest goes to administration and other programs. Thirty million dollars of TANF funds goes to a wholly different State agency.[7]

*Thousands* of Mississippians apply for that $4 million. But the application process is, in the words of the State executive currently in charge of the money, an "unbelievable" and "very difficult" labyrinth.[8] Less than 10% of applicants make it through the eligibility process.[9] It's so byzantine that the flow chart showing the eligibility process would be too small to decipher if pasted in the body text of this Order. A full-page version is reproduced in an appendix, although it is still unintelligible even at that scale.

Given the above, it is no surprise that "for every 100 families living in poverty in Mississippi, only 4 receive TANF cash assistance."[10] And for those fortunate enough to make it through, the amount of the aid is lower than one might think. A single mother with two children who receives TANF cash assistance gets $260 a month, not even $9 per day.[11]

In 2018 and 2019, Mississippi's top officials secretly created yet another off-ramp for TANF funds—one designed to waste taxpayer money rather than serve Mississippians. The officials gave the money to their friends and allies for do-nothing contracts. It was essentially a reverse Robin Hood: they stole from the poor and gave to the rich.

---

[6] *Id.*
[7] Bobby Harrison, *Mississippi increases monthly welfare check for first time since 1999*, Miss. Today (Mar. 25, 2021).
[8] Anna Wolfe, *If you count unspent millions, high denial rate and mysterious outcomes, the TANF scandal persists*, Miss. Today (Oct. 16, 2024).
[9] *Id.*
[10] Aditi Shrivastava, *Mississippi Should Use TANF to Improve Financial Stability for Families Experiencing Poverty* (Oct. 7, 2022) (citation omitted).
[11] *Id.* (citation omitted).

2

What follows is an abbreviated version of that fraudulent scheme. It is presented through the lens of federal prosecutions because it is intended to provide context for understanding *this* federal prosecution, in which the government alleges that Theodore M. Dibiase, Jr. unlawfully benefitted from the TANF scheme.[12] *See United States v. Dibiase*, No. 3:23-CR-35-CWR-LGI, Docket No. 3 (S.D. Miss. Apr. 18, 2023). Context is also particularly important to the present motion. In it, the government claims that previous work by Mr. Dibiase's defense attorneys may have resulted in a conflict of interest that prevents them from continuing with the representation.

After considering the facts, governing law, and arguments of counsel, the Court concludes that the circumstances of this case do not require disqualification. The reasons are provided below.

Readers are reminded that the description of others' confessed guilt has no bearing on the defendant in this case. Mr. Dibiase is innocent unless and until the government persuades a jury of 12 peers, beyond a reasonable doubt, that he is guilty of a criminal offense. That trial will commence in August 2025.

I.  **Factual and Procedural History**

  A.  **The TANF Fraud Scheme**

This fraudulent scheme revolved around John Davis. From 2016 to 2019, he ran the Mississippi Department of Human Services (MDHS), the State agency that distributes federal TANF money.

---

[12] Readers desiring additional perspective can turn to many other sources of information. They include Anna Wolfe's Pulitzer Prize-winning reporting "The Backchannel," and ongoing state-court litigation in which the State of Mississippi is trying to recoup the TANF money.

3

Davis and his co-conspirators sent TANF funds to organizations and companies under the false pretense that the money would be used to serve the poor, or "inner-city youth," as they claimed in one such grant. It was a lie. The grant recipients were either unqualified or had no intention of doing the work. Davis has now pleaded guilty to conspiracy and stealing from programs receiving federal funds.[13] He has not been sentenced.

The Family Resource Center of North Mississippi was one of the organizations that participated in the scheme. Davis sent federal funds to the Center, then told its Executive Director to subgrant about $1.2 million to unqualified individuals and companies of his (and apparently others') choosing. The Executive Director has pleaded guilty to knowingly misapplying the federal money.[14] She has not been sentenced.

Dale Brett Dibiase was one of the ultimate recipients of the federal funds. For whatever reason, Davis directed MDHS and the nonprofit conspirators to give Dibiase about $180,000 in federal money, purportedly so Dibiase could provide (anti-)substance abuse programming. Because Dibiase spent it on himself, he pleaded guilty to a federal conspiracy charge.[15] He has not been sentenced.

A key person in the scheme was Nancy New. She ran a "for-profit school district" and a nonprofit called the Mississippi Community Education Center (MCEC). Davis used MCEC as a pass-through to achieve his unlawful ends, and Ms. New—there's no way around this, unfortunately—knew it. She pleaded guilty to knowingly engaging in a $255,000 transaction with proceeds of a criminal scheme.[16] She has not been sentenced.

---

[13] *United States v. Davis*, No. 3:22-CR-104-CWR-LGI, Docket No. 3 at 5 (S.D. Miss. Sept. 15, 2022).
[14] *United States v. Webb*, No. 3:23-CR-21-CWR-LGI, Docket No. 16 at 32 (S.D. Miss. Mar. 27, 2023).
[15] *United States v. Dibiase*, No. 3:23-CR-14-CWR-LGI, Docket No. 16 at 36 (S.D. Miss. Mar. 13, 2023).
[16] *United States v. New*, No. 3:21-CR-28-CWR-LGI, Docket No. 29 at 12 (S.D. Miss. July 13, 2021). Ms. New's federal conviction concerned misspending of education funds. The state-court proceedings nevertheless

4

Nancy New ███████████████████████. We now know that Zach, an officer of one of his mother's for-profit entities, followed her path into unlawful conduct. He pleaded guilty to fraud standing next to her in the courtroom.[17] He has not been sentenced.



The most recent guilty plea came from Jacob Vanlandingham, a biomedical scientist in Florida. Vanlandingham told Davis and MCEC that he could use TANF money to develop a pharmaceutical treatment for concussions. He got $1.9 million from them. The sum represents about half of all cash assistance made available in a year. But Vanlandingham then diverted a substantial amount of the money to personal ends. He pleaded guilty to wire fraud and, like his brethren, has not been sentenced.[18]

The Court has just summarized the guilty pleas of six persons. Although we do not know with certainty why the government has asked for their sentencing hearings to be delayed, the most straightforward inference to be drawn is that the government wants to ensure that they testify honestly against other persons involved in the fraud. And that brings us to the defendant in this case, Theodore M. Dibiase, Jr.

---

make clear that she was deeply involved in misspending of TANF funds. Emily Wagster Pettus & Jeff Amy, *Ex-Welfare Chief, Wrestler Charged in Mississippi Fraud Case*, Assoc. Press (Feb. 5, 2020).
[17] *United States v. New*, No. 3:22-CR-53-CWR-LGI, Docket No. 1 at 2 (S.D. Miss. Apr. 20, 2022).
[18] *United States v. Vanlandingham*, No. 3:24-CR-70-CWR-LGI, Docket No. 18 at 28 (S.D. Miss. July 28, 2024).

5

B.  **This Case**

In April 2023, a federal grand jury in this District returned a 13-count indictment against Theodore M. Dibiase, Jr. Docket No. 3. The last name is already familiar to the keen-eyed reader; his brother Dale Brett Dibiase pleaded guilty to involvement in the same fraudulent scheme.[19] For the sake of clarity, the remainder of this Order uses "Dibiase" to refer to Theodore M. Dibiase, Jr.

The indictment begins with the basics: TANF money is intended to help the poor; the federal government sends it to MDHS every year, and MDHS grants some to nonprofits like the Family Resource Center and MCEC to fulfill certain purposes. The indictment then alleges that in 2018, Davis and those nonprofits sent approximately $2.75 million to Dibiase, spread among five sham contracts with Dibiase's companies, despite knowing that no work would be performed. Dibiase used the money on (among other things) a motor vehicle, a boat, and the down payment of a house, the indictment claims. Dibiase is charged with one count of conspiracy, six counts of wire fraud, two counts of stealing federal funds, and four counts of money laundering.

Dibiase pleaded not guilty. As mentioned above, he remains not guilty unless and until a jury of his peers unanimously concludes that the government has proven these allegations beyond a reasonable doubt, or he elects to do what the others have done and plead guilty.

---

[19] Wrestling fans know their father, Ted Dibiase, "the WWE legend known as 'The Million Dollar Man.'" Ken Dilanian, *Son of wrestling legend 'The Million Dollar Man' charged in welfare scandal involving Brett Favre*, NBC News (Apr. 20, 2023).

6

C.     **Background on the Immediate Dispute**

In many ways this case proceeded in the usual manner. The lawyers for both sides exchanged documents. With so many documents, emails, and text messages, the exchange required millions of records to be sifted and reviewed. This took time.

In July 2024, the government asked Dibiase's lawyers Scott Gilbert and Sidney Lampton, who practice with Watkins & Eager PLLC, if their client might have any interest in a plea deal. Gilbert responded that it was unlikely given differences in the way Dibiase had been treated relative to others. And when pressed to elaborate, Gilbert said plenty of other people received similar contracts but somehow evaded criminal prosecution.

This exchange evidently triggered the prosecutors' deeper reflection about other persons who received TANF money. The prosecutors then raised the potential conflict of interest issue with Gilbert in September 2024. The present motion followed in October 2024.

The government begins with a series of factual claims. It says Watkins & Eager represented **MCEC** from 2018 to about August 2020. During that period, firm attorneys assisted MCEC in a contractual dispute with another TANF grant recipient, represented MCEC in a reimbursement dispute with MDHS, and helped MCEC respond to a federal subpoena issued to investigate the TANF scandal. It is not clear to the Court whether Nancy or Zach New were associated with MCEC at any point during that time frame.

In late 2019 or early 2020, **Dibiase** hired Watkins & Eager to represent his interests in the fallout from the TANF scheme. We know that in part because in April 2020, MCEC and Dibiase waived any potential conflicts associated with Watkins & Eager's simultaneous

7

representation of them.[20] The government also knew of the representation, too. In May 2020, attorney Gilbert told federal investigators that he represented Dibiase in connection with subpoenas that had been issued to Dibiase's companies. In July 2020, moreover, Gilbert formally entered his appearance on Dibiase's behalf in a related civil forfeiture matter filed by the same United States Attorney's Office.[21]

Around the same time, Watkins & Eager represented ▆▆▆▆▆▆▆. We do not know exactly when that representation began, but it lasted for at least four months in mid-2020. In that engagement, attorney Gilbert ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

In summer 2020, therefore, Watkins & Eager represented MCEC, Dibiase, ▆▆ ▆▆ in matters related to the TANF scheme.

The government believes that the firm stopped representing MCEC in or around August 2020, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. That means both are "former clients."

The government filed this criminal case in April 2023. Watkins & Eager has defended Dibiase the entire time. But it wasn't until September 2024 that the government thought that Watkins & Eager might have a conflict that prevents it from representing Dibiase.

The government's request for relief is multi-part. It asks the Court to conduct an inquiry into whether a conflict of interest exists that would preclude Watkins & Eager's

---

[20] The Court has reviewed the waiver *in camera*. Using plain English, it explained to MCEC and Dibiase the scope of the firm's intended work, the applicable rule (Mississippi Rule of Professional Conduct 1.7), the risks and benefits of keeping the firm as counsel, and MCEC and Dibiase's opportunity to seek outside advice. A signature page shows that Dibiase and MCEC's Interim Director waived the potential conflict of interest. The Court presumes from this that Ms. New was no longer in a position of responsibility at MCEC.
[21] *United States of America v. The Real Property Known as 115 Rosedowne Bend Madison, MS 39110*, No. 3:20-CV-415-DPJ-ASH, Docket No. 13 (S.D. Miss. July 28, 2020).

8

further representation of Dibiase, and if so, whether that conflict is waivable. If it is not waivable, the government asks the Court to remove Watkins & Eager from the case.

Dibiase and his law firm oppose relief. They find the timing of the government's motion suspicious, since it came on the heels of their signal that Dibiase would put up a fight and demand a trial, which at the time was set to begin on January 7, 2025.[22] They note that Dibiase has a constitutional right to choose the counsel he believes would best defend him. Disqualification would be prejudicial, since starting over with new counsel would cost additional time in pretrial limbo and a substantial sum of money as the new attorney(s) review millions of documents from scratch. Dibiase and Watkins & Eager also contend that the firm represented MCEC as an entity ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

In rebuttal, the government first emphasizes that the representation of overlapping actors at least merits judicial scrutiny, no matter the outcome of the motion. It then urges the Court to dispense with the formalism of Watkins & Eager's representation of MCEC as an entity and look practically at the information the firm would have gleaned from Nancy New, who (it says) led the organization until early 2020. Lastly, the government argues that the timing of its motion is "irrelevant" because it would have a duty to raise a conflicts issue no matter when it was first observed. Docket No. 39 at 9 (quoting *United States v. Beach*, No. 2:19-CR-14-KS-MTP, 2019 WL 4308538, at *3 (S.D. Miss. Sept. 11, 2019)).

The Court held two hearings on the subject, essentially agreeing with the government's arguments to scrutinize the matter. Counsel for each side presented exhaustive

---

[22] "It is generally proper for an opposing party to bring conflict of interest matters to the attention of the court." *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1315 (5th Cir. 1995) (citation omitted). "A tortured justification for disqualification," however, "suggests not so much a conscientious professional concern for the profession and the client of the opposing counsel as a tactic designed to delay and harass." *Id.*

arguments in support of their position. The Court reviewed *in camera* the thorough written waiver of any arguable conflict of interest that MCEC signed and delivered to Watkins & Eager.[23] It then heard Dibiase personally and repeatedly express his understanding of the situation, its risks, and his desire to move forward with Watkins & Eager. *See United States v. Greig*, 967 F.2d 1018, 1021–22 (5th Cir. 1992). In addition, the Court heard from current counsel for MCEC ███████████████████████████████████████████████. No ruling issued from the bench.

## II.  Legal Standard

The Sixth Amendment guarantees "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (citations omitted). "It commands . . . that the accused be defended by the counsel he believes to be best," *id.* at 146, recognizing that "the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial," *id.* at 150.

At the same time, the Sixth Amendment also guarantees a defendant's "right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981) (collecting cases). A defendant may not be represented by "an attorney who has a previous or ongoing relationship with an opposing party." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Such a conflict may "prevent an attorney from challenging the admission of evidence

---

[23] The government argued that MCEC and Dibiase could not execute a lawful waiver. The contention was that any waiver would lack informed consent because Dibiase could never be told all of MCEC's secrets. The government's definition of informed consent is not consistent with Fifth Circuit precedent. *See United States v. Casiano*, 929 F.2d 1046, 1053 (5th Cir. 1991). It operates at a level of generality that risks invalidating all waivers in these situations. Attorneys can fully inform clients that they know a potential witness's secrets without disclosing those secrets. *Id.*

10

prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another." *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978).

The reconciliation of these interests has resulted in the following legal standard: "there is a presumption in favor of a defendant's counsel of choice, but that presumption may be overcome by an actual conflict of interest, or by a showing of a serious potential for conflict. This is true even when a defendant expresses a desire to waive the potential conflict." *United States v. Gharbi*, 510 F.3d 550, 553 (5th Cir. 2007) (citations omitted).

"An 'actual conflict' exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000) (citations omitted); *see Galloway v. State*, 298 So. 3d 966, 975-76 (Miss. 2020).

As an example, in a 2007 drug-distribution case, a defense attorney attempted to represent both the defendant "and his brother as co-defendants, and also represented at least one witness who was attempting to obtain a reduction in his sentence" by cooperating with the government. *United States v. Sanchez Guerrero*, 546 F.3d 328, 331 (5th Cir. 2008). The defendant tried to waive the conflict of interest, but the trial judge refused to let the case proceed with an attorney so conflicted. The Fifth Circuit affirmed. The conflict of interest was intolerable, since "each brother would have an interest in downplaying his own culpability while emphasizing the responsibility of the other in the organization." *Id.* at 334.

"Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear

11

fair to all who observe them." *Wheat*, 486 U.S. at 160. It follows that "a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel." *Id.* (citation omitted).

"In considering whether a conflict exists which would warrant disqualification, courts look to state and national ethical standards adopted by the court." *United States v. DeCay*, 406 F. Supp. 2d 679, 683 (E.D. La. 2005) (citations omitted). In addition to the case law, therefore, this Court takes into account the State rules of professional conduct. The Rule applicable here is Mississippi Rule of Professional Conduct 1.9. It provides, in its entirety:

> A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> (a) represent another in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
>
> (b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

Miss. R. Prof. Cond. 1.9.

Trial courts are afforded "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (citations omitted). The Supreme Court acknowledges that trial courts in these situations "face the prospect of being 'whip-sawed' by assertions of error no matter which way they rule." *Wheat*, 486 U.S. at 161. If the court permits the arguably-conflicted counsel to proceed, "the defendant may well claim that he did not receive effective assistance," and yet if the court disqualifies the attorney and requires a new attorney to take over, the defendant may claim that the court violated his Sixth Amendment right to counsel of choice. *Id.* (collecting cases).

12

There also is a significant problem of indeterminacy. The Supreme Court described it well in the *Wheat* decision:

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

*Id.* at 162–63.

At the end of the day, therefore, a trial court faced with this kind of dilemma must consider the unique circumstances of the case alongside the competing constitutional principles, and ultimately rely "on instinct and judgment based on experience in making its decision." *Id.* at 163.

III. **Discussion**

The analysis begins with a presumption that Dibiase is entitled to the counsel of his choice. *See Gharbi*, 510 F.3d at 553. The Court then presumes that Watkins & Eager gained confidential information from former clients MCEC ▬▬▬▬▬▬▬▬ during its representation of them. Any information one attorney in the firm gained during that work is imputed to everyone else in the firm.

13

The question then is whether the record shows an actual conflict of interest or a serious potential for conflict between Dibiase and others formerly represented by Watkins & Eager. Will Watkins & Eager have to "pull punches on cross-examination, thereby providing ineffective assistance to" Dibiase, or alternatively attack MCEC ▬▬▬▬▬▬▬ with confidential information, essentially underbussing their former clients' confidences to benefit their current client? *Id.*

So far, the Court believes the answer is "no."

▬▬▬▬▬▬▬ any conflict is both speculative and avoidable. *See Mickens v. Taylor*, 535 U.S. 162, 169 (2002) (noting, in the multiple representation context, that there is nearly always "a vague, unspecified possibility of conflict"). The government says it "cannot rule out" calling ▬▬▬▬, but it is not presently clear why it would want to.



The situation with MCEC is more concrete in one sense. The government says it *will* call Nancy and Zach New to testify about what they did at MCEC. Yet the circumstances are also hazy here, since the record has (so far) only established that Watkins & Eager represented MCEC as an entity, rather than its executives in their individual capacities.

In any event, accepting that Watkins & Eager will be called upon to cross-examine Nancy and Zach New, the current proceeding does not elucidate how the attorneys have an incentive to pull their punches. ▬▬▬▬▬▬▬▬▬▬

14

███████████████████████████████████████████████████

███████████████████████████████████ And to the extent they wish to use Nancy and Zach New's testimony to illustrate how many other entities and persons MCEC wrongfully sent TANF funds to, they don't need to mention ████████████████. There are many other options available to them to land this blow with the jury.[24]

The Court recognizes the uncertainty. It does not and cannot know the parties' thinking about who to call or what evidence to present at trial. And materiality is difficult to gauge at this early stage, for all the reasons the Supreme Court explained in *Wheat*.

This Court can, however, emphasize to the parties that they have agency over how they move forward. *See Perillo*, 205 F.3d at 802 (describing one way a potential for conflict "would never have come to fruition"). The parties say they wish to try this case sooner rather than later. The Court wants the same thing. Resolving this matter promptly serves the ultimate interests of Dibiase, the United States, and the public. So the Court has set the trial for August 2025.

Counsel for the United States and Dibiase are asked to refrain from doing anything that would push this matter past August 2025 or trigger a need for a new trial years down the line. A delayed or second trial would be held at great expense and inconvenience to all involved.[25] The government is likely in the driver's seat here because it controls its case-in-chief. Yet counsel for Dibiase also has obligations under the constitutional and ethical

---

[24] To be clear, the Court is not today adjudicating whether any line of inquiry mentioned in this paragraph or Order can be raised before a jury.
[25] The burdens would also be shared by the defendants awaiting sentencing. They might be eager to get the Dibiase trial behind them, as it represents a major step toward finality in their own cases.

standards laid out above. If Watkins & Eager is unable to continue the representation, it must speak up.

IV. Conclusion

The motion is granted to the extent that a thorough judicial inquiry was held. It is denied on the merits without prejudice to its re-urging, if necessary. That means Watkins & Eager may continue to represent the defendant. The parties shall proceed to secure the Protective Order they desire and exchange the next round of discovery.

**SO ORDERED**, this the 5th day of December, 2024.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

## Appendix

"TANF Intake/Eligibility Determination Process"



**Source:** Mississippi Department of Human Services Director Bob Anderson's presentation to Mississippi lawmakers on October 15, 2024, as reproduced in Anna Wolfe, *If you count unspent millions, high denial rate and mysterious outcomes, the TANF scandal persists*, Miss. Today (Oct. 16, 2024).