IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

v.                                             CRIMINAL NO.: 3:23-cr-00035-CWR-LGI

THEODORE M. DIBIASE, JR.
a/k/a "TED DIBIASE, JR." a/k/a
"TEDDY DIBIASE

## MOTION TO CONTINUE TRIAL AND ALL RELATED DEADLINES

COMES NOW, Defendant Theodore M. DiBiase, Jr., by and through counsel, and files this Motion to Continue Trial and all Related Deadlines in the above-styled and referenced cause, and in support of the motion, Defendant shows the following:

1. On May 18, 2020, Mr. DiBiase learned that he was the subject of a federal investigation via correspondence from an Assistant United States Attorney.

2. Almost three (3) years later, on April 18, 2023, the United States indicted Mr. DiBiase. *See* [ECF No. 3]. In relevant part, the indictment alleges that Mr. DiBiase "through his companies, Priceless and Familiae, entered into at least five sham contracts with FRC and MCEC, which were used as vehicles to defraud and steal federal funds from MDHS through FRC and MCEC." *Id*. at ¶ 20. In fact, the indictment alleges that Davis directed FRC and MCEC to disburse full or almost full payments pursuant to DiBiase "regardless of whether any work had been performed and knowing that no work likely ever would be performed." *Id*. at ¶ 21. Further compounding the United States' theory, the indictment states that "FRC and MCEC provided federal funds from MDHS to DIBIASE and his companies, Priceless and Familiae, for social services that DIBIASE did not provide and did not intend to provide." *Id* at ¶ 22.

3. The trial of this matter is set to begin on August 26, 2025. Defense counsel has maintained that an August 2025 trial was likely not possible.

1

4. On July 1, 2025 – two years, two months, and thirteen days after the indictment was filed and less than 60 days before trial – Mr. DiBiase received the United States' **_sixth_** document production. In relevant part, the sixth production includes 72 videos of MDHS "Law of 16" trainings – which equates to 47 hours and 39 minutes of video footage. Law of 16 is a leadership program that Mr. DiBiase worked to create and then implement throughout MDHS.

5. The 72 videos did not require redaction or privilege review by the United States prior to their production. Yet, it took over two years for the United States to produce the videos to the Defendant.

6. These 72 videos are directly exculpatory evidence. The United States has now provided 47 hours and 39 minutes of evidence showing that Mr. DiBiase performed a substantial amount of work under the alleged "sham" contracts. Again, the indictment states that DiBiase did not provide and did not intend to provide social services. This is belied by copious video footage that the United States just produced.

7. The defense must now parse through the videos and identify potential witnesses and use the videos to rebut the notion that these were sham contracts and show that the work Mr. DiBiase did was substantive and meaningful.

8. As stated above, the United States began investigating this matter well before the April 2023 indictment. In fact, the United States has been investigating this matter for at least five years.

9. As the Court is aware, prior to its sixth production, the Government had already produced a historically large amount of discovery that necessitated the Defendant to retain an electronic discovery ("e-discovery") vendor. Notably, after an exhaustive and lengthy review, defense counsel determined that almost 95% of the discovery was wholly irrelevant to the case.

10. As will be shown in greater detail below, defense counsel has worked diligently to review the discovery produced by the United States and prepare for trial. Moreover, Mr. DiBiase is not seeking a continuance for the purpose of delay; instead, he seeks a continuance in the interests of justice and fairness.

11. Mr. DiBiase should not be required to proceed to trial without allowing his counsel a reasonably necessary amount of time to meaningfully review the discovery the government chose to produce, after a three-year head start. The timeline below establishes that the request for this continuance is a reasonable one, given the diligence with which defense counsel has handled the review of the momentous amount of discovery produced by the government.

12. The procedural posture of the case, including but not limited to the United States' voluminous discovery production and defense counsel's response thereto, is as follows:

| | |
|---|---|
| **April 18, 2023** | The United States indicted Mr. DiBiase. [ECF No. 3]. |
| **April 20, 2023** | The Court entered its initial Trial Order, setting the trial of this case on June 20, 2023. [ECF No. 18]. |
| **April 27, 2023** | The United States filed an Unopposed Motion to Continue and for a Special Trial Setting. [ECF No. 21]. |
| **May 17, 2023** | The United States provided its **first** production of documents, which was comprised of 550 Gigabytes (0.55 Terabytes) of discovery in Relativity load files.[1] But, based on later representations by the United States, defense counsel understood that it anticipated producing "a little over 1 Terabyte of data" in Relativity load format. [ECF No. 22-1 (Ex Parte) at p. 4], also attached hereto as Exhibit "A". Defense counsel and the United States begin engaging in discussions regarding discovery in this case. |
| **May 23, 2023** | The United States informed defense counsel that it has "a little over 1 Terabyte of data (approximately 1200 GB) on [its] database (not included the 5.5 GB [it] just produced to [Defendant]." *Id*. |

---

[1] Relativity is a document review platform for electronically stored information ("ESI"). Raw data is processed and put into "load files" that allows the Relativity program to search and segregate data based on certain criteria. [Ex Parte ECF No. 22-3]. Notably, if a party does not have access to the Relativity program, it cannot use Relativity load files. In other words, in May of 2023, the United States production was not in a useable format for Defendant.

| | |
|---|---|
| **June 6, 2023** | Defense counsel had a meeting with Logickull, an e-discovery vendor, to seek a quote for handling the DiBiase matter. |
| **June 7, 2023** | The Court entered a text order granting the Motion to Continue [ECF No. 21]. The trial date was not reset. |
| | Defense counsel approached IST Management (IST), another e-discovery vendor, to seek a second quote for handling the DiBiase case. [ECF No. 22-5 (Ex Parte)]. |
| **June 19, 2023** | Defendant filed an Ex Parte Motion for CJA Funds to retain IST as an e-discovery vendor. [ECF No. 22 (Ex Parte)]. |
| **July 21, 2023** | The Court held a hearing on Defendant's Ex Parte Motion for CJA funds to retain an e-discovery vendor. |
| **July 27, 2023** | The Court granted Defendant's Ex Parte Motion for CJA funds to retain IST. [ECF No. 24 (Ex Parte)]. |
| **July 31, 2023** | The United States provided its **second** production of documents. This production included a significant amount of data that was not in Relativity load format. |
| **August 11, 2023** | The United States provided its **third** production of documents. |
| **August 14, 2023** | The Court held a telephonic status conference with the parties. |
| **August 29, 2023** | Defense Counsel emailed the United States regarding issues Defendant's e-discovery vendor, IST, was having with the United States' second production and noted that IST was in the process of uploading the third production to Relativity. *See* Exhibit "B"; 2023-08-29 Email from S. Gilbert to Government. |
| **September/ October, 2023** | Defense counsel worked with IST to de-duplicate and remove junk files. At this stage, IST had uploaded 1,491,431 documents to the Relativity workstation and, of those, had removed 343,673 documents. Defense counsel also examined the various options for addressing the discovery that the United States had produced in different forensic containers (Axiom, Cellebrite, and Gray Key). In other words, discovery that was not in Relativity load file. Ultimately, with IST's guidance, defense counsel determined that it would not be able to review the entire universe of discovery unless it was all included in the Relativity workstation. As such, defense counsel began drafting Defendant's Second Ex Parte Motion for CJA Funds. |

| | |
|---|---|
| **October 16, 2023** | The Court held a status conference with the parties and set the trial of this matter to begin on July 16, 2024. |
| **November 30, 2023** | Defendant filed his Second Ex Parte Motion for CJA Funds, noting that the second and third production included 3.0 Terabytes of data in *compressed* forensic containers that would likely expand to be 4.5 Terabytes of data when extracted from the compressed forensic containers. [ECF No. 26 (Ex Parte)]. In total, the United States' first, second, and third production amounted to approximately 6 Terabytes of data, *i.e.*, six (6) times the amount of data than was expected when Defendant filed his first motion requesting CJA funds. **According to Google AI, 6 Terabytes of data is roughly equivalent to 85 million pages of Word documents.** |
| **December 11, 2023** | The Court granted Defendant's Second Ex Parte Motion for CJA Funds. [ECF No. 27 (Ex Parte)]. |
| **January/ February 2024** | Throughout January and February, IST informed the undersigned of certain issues with the document production that it identified during its extraction of the data. For example, certain files were encrypted, and the United States had not provided the passcode to access the encrypted files. The undersigned worked with the United States to correct any such issues to the best of each parties' abilities. As a result of the aforementioned issues, it took IST approximately 3 months to complete its extraction of the relevant data, processing thereof, and its subsequent upload into the Relativity program. |
| **March 20, 2024** | IST informed defense counsel that it had completed the extraction process and had uploaded all data into Relativity. |
| **March 21, 2024** | The Court held a status conference with the parties and reset the jury trial to January 7, 2025. |
| **April 4, 2024** | The United States provided its **fourth** production of documents. |
| **April 9, 2024** | Defense counsel sent the hard drive of the fourth document production to IST via FedEx. |
| **April 26, 2024** | IST returned the hard drive to defense counsel. |
| **April 29, 2024** | IST emailed defense counsel and noted that, on April 26, it had mistakenly returned the hard drive to Watkins & Eager, but that IST was not finished with the assessment thereof and needed the hard drive to be returned. |

| | |
|---|---|
| **May 3, 2024** | IST received the hard drive that defense counsel had returned at IST's request. |
| **May 13, 2024** | IST completed its assessment of the hard drive, noting that it had a corrupt component. |
| **May 14, 2024** | IST informed defense counsel that the last of the data had been processed and de-duplicated. It took approximately 5 months for IST to complete its review (January to May). IST had to extract 3 Terabytes of nonduplicative data from 3 different "forensic containers", run forensics thereto, remove any and all junk data, process the relevant data into Relativity load files, upload the relevant data to the Relativity workspace, and then run date scoping and deduplication tools on the data in Relativity.<br><br>At this point, in total, IST had uploaded **2,602,608 documents** into the Relativity workspace. **Notably, this is the number of documents not the number of pages. Many were multi-page documents.** Of the 2,602,608 documents, IST was able to remove **845,845** documents – leaving 1,756,763 documents to review. |
| **May 14-29, 2024** | When IST finished uploading the data into the Relativity workspace, defense counsel evaluated the efficiency and cost of using only Relativity's normal features, *i.e.*, search terms, date scoping and other sorting capabilities. The undersigned reviewed 12,356 documents, of which 584 were tagged "responsive" and 11,772 were tagged "not responsive". The undersigned also tagged and categorized the 584 "responsive" documents so that they can be identified and/or tied to the various issues in the indictment. This includes a "hot document" designation for documents to be potentially used at trial as evidence *or* for impeachment.[2] To be clear, the undersigned did not actually "look at" 12,356 documents. Instead, the undersigned worked with IST such that, once an irrelevant document was discovered, IST created a search to pull emails and other documents that corresponded to the irrelevant document. For example, there were a large number of documents related to MEMA's response to a natural disaster. IST created a search for documents related to that natural disaster and marked the resulting documents as "non-responsive" without the need for individual review. However, this process is much more difficult than it appears, and it takes significant time for IST to create searches that capture the "irrelevant" documents without inadvertently capturing a "relevant" document. If there is not a clear category of |

---

[2] This is important because the United States has provided numerous indexes of the documents in its production that specifically identify **814,182** documents. Yet, upon review, some of defense counsel's "hot documents" were *not* identified on the United States' indexes. As such, the undersigned cannot limit their document review to the 814,182 documents identified by the United States.

|  |  |
|---|---|
|  | irrelevant documents that could be identified with an IST search, and a large number of documents to be deleted after running the search, the process of creating one is neither timely nor economically efficient. |
| **May 29, 2024** | After realizing that it would be impossible to review the 1,756,763 documents in time for a January 7, 2025 trial date, Defense counsel met with IST to discuss using "Brainspace" – an artificial intelligence program – to assist in the document review. Brainspace utilizes "predictive coding" which is a process where an attorney reviews a smaller set of documents and Brainspace extrapolates the attorney's judgment calls and applies them to the remaining data. In other words, Brainspace is constantly evolving because it *learns* as an attorney tags documents. To do this, Brainspace creates "batches" of documents (typically 250 at a time) for an attorney to review. As it learns, via predictive coding, Brainspace's batches start to populate with more and more relevant documents. At a certain point, the Brainspace program will create a "score" for every document such that any document that falls under a certain "score" is deemed non-responsive. In other words, there will be a point where attorneys can stop reviewing the documents uploaded into Brainspace because the AI program has determined those documents are non-responsive. For the Brainspace program to work an attorney has to review a certain number of documents to ensure that the program correctly identifies relevant documents, segregates "irrelevant" documents, and has enough information to create the responsiveness score. |
| **May 31, 2024** | Upon learning the massive impact that Brainspace can have on a document review, defense counsel authorized IST to begin the process of uploading documents into the Brainspace program. |
| **June 3, 2024** | At IST's recommendation, defense counsel finished working with IST to review, remove, and delete approximately 35,000 documents from the Relativity workstation via Relativity's normal tools, *i.e.*, date scoping, de-duplicating, etc., before IST uploaded documents into Brainspace. |
| **June 5, 2024** | IST shipped defense counsel a hard drive containing approximately 35,000 documents that it had identified to be removed from the Relativity workstation. |
| **June 10, 2024** | After receiving confirmation that Watkins & Eager had received the hard drive with the 35,000 documents, IST deleted those documents from the Relativity workstation and, thereafter, uploaded 1,308,621 documents into Brainspace. |

| | |
|---|---|
| **June 12, 2024** | Defense counsel met with IST to discuss the Brainspace program and the next steps related thereto. IST began preparing Brainspace batches, each of which typically contained 250 documents for defense counsel to review. |
| **June 27, 2024** | Defense counsel finished reviewing the first Brainspace batch, which included approximately 350 emails and attachments thereto. IST began creating new batches for review. |
| **July/August 2024** | Defense counsel continued the process of reviewing discovery in the Brainspace batches. Defense counsel had an average review time of 30 documents per hour. |
| **September 2024** | Defense counsel continued reviewing Brainspace batches. The undersigned had a complicated fraud trial that was scheduled to begin on October 7, 2024 in front of Judge Jordan and both Ms. Lampton and Mr. Gilbert spent the majority of September preparing for trial. On September 25, 2024, the United States dismissed the indictment in that matter. |
| **September 13, 2024** | Recognizing that the review of the remaining documents would take years, defense counsel and IST met to discuss using ITS's Document Review Team to do a first pass review of the remaining 1,308,621 documents. The purpose of the first pass review is to eliminate obviously irrelevant documents and to tag and categorize documents that have a likelihood of being relevant to an issue in the case. |
| **October 10, 2024** | The United States filed its Motion for Judicial Inquiry regarding potential conflicts of interests of defense counsel. [ECF No. 33]. |
| **October 21, 2024** | Defendant filed his Response in Opposition to the United States' Motion for Judicial Inquiry. [ECF No. 37]. |
| **October 22, 2024** | The Court held an initial hearing on the United States' Motion for Judicial Inquiry. At this hearing, defense counsel learned that the United States anticipated producing an additional *two million* financial records. |
| **October 23, 2024** | The Court continued the jury trial to a date unknown. |
| **October 29, 2024** | The United States filed its Reply in Support of its Motion for Judicial Inquiry. [ECF No. 39]. |
| **November 2024** | Defense counsel began drafting Defendant's Third Ex Parte Motion for CJA Funds and worked with IST on the same. |

| | |
|---|---|
| **November 15, 2024** | The Court held a second hearing on the United States' Motion for Judicial Inquiry. |
| **December 5, 2024** | The Court entered its Order finding that no conflict of interest exists. [ECF No. 40 (Restricted)]. |
| **December 10, 2024** | Defendant filed his Third Ex Parte Motion for CJA Funds, requesting funding for Brainspace and the employment of IST's Document Review Team. [ECF No. 41 (Ex Parte)]. |
| **December 12, 2024** | The United States provides its **fifth** production of documents. |
| **January 7, 2025** | The Court held a discovery hearing with the parties. At this hearing, defense counsel learned that the United States had *another document production forthcoming*. |
| | Defense counsel stated during this hearing that it could not be ready until at least October 2025. The Court reset the jury trial to begin on August 26, 2025. |
| | Following the discovery hearing, defense counsel argued its Third Ex Parte Motion for CJA Funds. |
| **January 10, 2025** | The Court granted Defendant's Third Ex Parte Motion for CJA Funds. [ECF No. 42 (Ex Parte)]. |
| **January 13, 2025** | Following the authorization of additional CJA funding, IST began uploading the United States fifth production into the Relativity workspace. |
| **Second half of January 2025** | Defense counsel worked with IST to prepare a comprehensive memorandum detailing the scope of the document review including, but not limited to, the relevant law, people, issues, and documents to search for. In other words, after receiving authorization to retain a document review team, defense counsel began preparing "document review instructions" for the review team to utilize during its review. |
| **February 5, 2025** | Defense counsel met with IST document review team leader and other relevant IST employees to discuss the draft document review instructions and any need to clarify/revise the same. |
| **February 10, 2025** | Based on IST's instructions/insight, Defense counsel began revising the draft of its document review instructions and circulated the revised copy. |

9

| | |
|---|---|
| **February 15, 2025** | IST emailed defense counsel their questions regarding the updated document review instructions. Defense counsel reviewed and answered the same. |
| **February 17, 2025** | Defense counsel met with the Document Review Team to provide an overview of the case and provide the team with the finalized document review instructions. |
| **February 18, 2025** | IST's Document Review Team – comprised of 30 attorneys – began its first level document review. Notably, throughout the review, IST provided a daily progress report and continually identified questions regarding certain documents that defense counsel reviewed and answered. As such, defense counsel was contemporaneously reviewing discovery during the IST document review. |
| **May 1, 2025** | IST's Document Review Team finished the first level document review. In total, the IST Document Review Team reviewed 462,872 documents and, of those, tagged 181,400 as responsive/relevant, *i.e.*, documents that need to be reviewed by defense counsel. Only about 39% of the documents were deemed potentially responsive/relevant. |
| **May 9, 2025** | IST's Document Review Team conducted its quality control review and completed the document review. The quality control review refined the responsive/relevant documents, going from 181,400 documents to 138,282 that need to be reviewed by defense counsel.[3] |
| **May 12, 2025** | The Court held a status conference with the parties. Defense counsel again expressed grave doubt that it could be ready for trial on August 26, 2025. |
| **May 14, 2025** | The parties submitted an agreed scheduling order that kept the August 26, 2025 trial date and set corresponding deadlines. |
| **May 14-30, 2025** | Defense counsel worked to finish its review of potential discovery material, reducing 28,000 images/pages to about 460 images/pages to produce to the government as Defendant's initial discovery production. |
| **May 30, 2025** | Defense counsel provided the United States with Defendant's first production. |
| **June 2025** | Defense counsel continued reviewing the 138,282 documents that IST's Document Review Team tagged as responsive/relevant. |

---

[3] Based on the document review, Brainspace used predictive coding to remove 1,293,891 documents as non-responsive without the need for individual review.

|  |  |
|---|---|
|  | Defense counsel continued reviewing documents for the purpose of producing reciprocal discovery. |
| **July 1, 2025** | The United States provided its **sixth** production of documents. The production includes 72 videos, *i.e.*, 47 hours and 39 minutes of video footage. It also includes 1,458 image files, 637 native files, and 637 text files (Relativity load files) that must be uploaded into IST's Relativity workstation. |
|  | Defense counsel provided the United States with Defendant's second production, *i.e.*, 317 images/pages. |
| **July 2, 2025** | Defense counsel sent the United States' sixth production to IST to be uploaded into the Relativity workstation. |

13.     As shown above, Defendant has been working aggressively to review the relevant documents and prepare for trial. Despite this, defense counsel needs more time to review the discovery, investigate factual allegations and to research in order to sufficiently prepare a defense.

14.     As of July 2, 2025 – of the 138,282 documents that IST's Document Review Team tagged as responsive/relevant – defense counsel has approximately 95,000 documents left to review. In other words, Defense counsel has yet to lay eyes on 95,000 documents that first pass attorney reviewers tagged as potentially relevant/responsive.

15.     Defense counsel reviewed approximately 43,000 documents over a two-month period. Assuming defense counsel can proceed with its current rate of document review, defense counsel should be able to review the remaining 95,000 documents within 5 months.

16.     Notably, it took a team of 30 lawyers 11 weeks (2 months and 21 days) to review 462,872 documents – many of which were immediately facially irrelevant.

17.     Moreover, based on the United States' sixth production, defense counsel now needs to identify people in the Law of 16 videos, interview them, and, likely, subpoena one or more of them as trial witnesses. The discovery of this material also changes the defense trial strategy. It is

axiomatic that such evidence, at a minimum, in the face of the allegations in the indictment, will significantly alter the cross-examinations of many of the government's witnesses.

18. In our July 1, 2025 status conference, the Court suggested that defense counsel assign additional counsel or paralegals to the defense team. The Court is aware that defense counsel has already engaged 30 additional contract lawyers, through its discovery vendor, to conduct a first pass document review. The purpose of the first pass review was to reduce the documents to a manageable number that Defendant's counsel of choice, who have substantial knowledge of the case, could then review.

19. It is precisely because of that measure that defense counsel can now represent to the Court it can be ready for trial during the first quarter of 2026. Respectfully, the undersigned is not aware of another case where the Court has imposed this sort of requirement on another party, government or otherwise.

20. A defendant has a constitutional right to the effective assistance of counsel. *See* U.S. Const., amend. VI. "[L]awyers have a constitutional obligation to review discovery as a part of their clients' Sixth Amendment right to effective assistance of counsel." Jenia I. Turner et. al., Article, <u>Neglected Discovery</u>, 73 Duke L.J. 1173, 1183 (2024). In fact, the Fifth Circuit has recognized that "[p]re-trial 'investigation and preparation are the keys to effective representation.'" *Washington v. Strickland*, 673 F.2d 879, 892 (5th Cir. 1982) (quoting ABA Projects on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function 224 (App. Draft 1971)). "[I]t is **reasonable** to expect that adequate defense investigation and preparation involves review of all evidence provided pretrial." *United States v. Evans*, Crim. No. PX-16-0421, 2017 WL 5624792, at *2 (D. Md. Nov. 21, 2017) (emphasis added).

12

21.     Here, defense counsel has worked diligently to review the discovery provided by the government. IST removed a significant amount of data prior to uploading it into the Relativity workstation. Yet, even with that data removal, IST ultimately uploaded **3.5 Terabytes** of data into the Relativity workstation. This is the equivalent of more than 40 million pages of Word documents.

22.     In total, IST uploaded **2,602,608 documents** into the Relativity workspace.

23.     As of today, IST and defense counsel have narrowed that number to only 138,282 responsive/relevant documents. This is a reduction of almost 95% of the documents.

24.     Of that 138,282, defense counsel has reviewed approximately 43,000 – leaving approximately 95,000 left to review.

25.     In a little over two years, defense counsel has made vast progress on this matter. This is especially true considering the fact that defense counsel has not had the complete United States production for the entire two year period.

26.     Every time the United States provided an unexpected document dump on the defense, it required defense counsel to: (a) work with IST to facilitate a plan to manage the additional documents; (b) draft a motion for additional CJA funds; (c) attend a hearing before the Court; (d) wait for the Court's ruling regarding the request for CJA funds; and (3) upon authorization for additional funds, work with IST to implement the proposed plan to manage the new discovery. This significantly slowed the discovery process.

27.     If the Court were to grant a continuance, it would permit defense counsel to complete the review of the discovery provided by the government. If this case were re-set during the first quarter of 2026, it would go to trial less than three years after the indictment was returned. Adequately preparing for trial during that timeframe would be exceptional, given the fact that the government produced an equivalent to 85 million pages of Word documents in discovery. The

13

Defendant is not seeking to unnecessarily delay his trial. This indictment hangs over his head and will continue to place a hold on his entire life until it is finally tried and resolved.

28. The facts and the equities weigh heavily in favor of a continuance until the early part of 2026. This case is less than three years old. As with any case, the government took all the time it deemed necessary to review evidence and prepare its case before choosing the time it would obtain an indictment. The discovery production in this case is fairly characterized as unheard of. Defense counsel is confident in making the representation to this Court that no additional continuances will be sought, assuming no additional discovery is provided. Given the consequences of a conviction, and the fact that this case can still proceed to trial within three years of the indictment, one additional continuance to ensure defense counsel has a minimally adequate opportunity to prepare for trial is not unreasonable.

29. The Defendant, after being fully advised of his rights pursuant to the Speedy Trial Act, agrees that the intervening time between this motion and a new trial date are excludable under the Speedy Trial Act, and waives any claim to the contrary. This request is not for delay but in the interests of justice and fairness.

WHEREFORE, PREMISES CONSIDERED, the undersigned respectfully moves this Honorable Court to grant this Motion to Continue and continue the trial of this matter to a future trial term.

RESPECTFULLY SUBMITTED, this 2nd day of July, 2025.

        WATKINS & EAGER PLLC

        THEODORE M. DIBIASE, JR., Defendant

        By: /s/ J. Scott Gilbert
           J. SCOTT GILBERT

OF COUNSEL:

J. Scott Gilbert (MS Bar #102123)
Sidney E. Lampton (MS Bar #105957)
WATKINS & EAGER PLLC
P. O. Box 650
Jackson, MS 39205-0650
Telephone:  601-965-1900
Facsimile:   601-965-1901
sgilbert@watkinseager.com
slampton@watkinseager.com